1

2

3

4

5

6

7

8                              UNITED STATES DISTRICT COURT

9                          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   FLOYD ESPEY,                                No.  2: 13-cv-2147 TLN KJN P

12                 Plaintiff,

13          v.                                    FINDINGS AND RECOMMENDATIONS

14   DEUEL VOCATIONAL INSTITUTION,
     et al.,
15
                   Defendants.
16

17

18   I.  Introduction

19          Plaintiff is a former state prisoner, proceeding without counsel, with a civil rights action

20   pursuant to 42 U.S.C. § 1983.  Pending before the court is defendants' motion for summary

21   judgment.  (ECF No. 73.)

22          On May 14, 2015, the undersigned ordered defendants to file amended declarations and an

23   amended statement of undisputed facts clearly identifying the medical records referenced in these

24   documents.  (ECF No. 88.)  On May 28, 2015, defendants filed these amended documents.  (ECF

25   No. 89.)  Accordingly, these findings and recommendations refer to the amended declarations and

26   amended statement of undisputed facts.

27          After carefully reviewing the record, the undersigned recommends that defendants'

28   motion for summary judgment be denied in part and granted in part.

1

1    II. <u>Legal Standard for Summary Judgment</u>

2         Summary judgment is appropriate when it is demonstrated that the standard set forth in

3 Federal Rule of Civil procedure 56 is met.  "The court shall grant summary judgment if the

4 movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

5 judgment as a matter of law."  Fed. R. Civ. P. 56(a).

6         Under summary judgment practice, the moving party always bears the initial

7 responsibility of informing the district court of the basis for its motion, and identifying those

8 portions of "the pleadings, depositions, answers to interrogatories, and admissions on file,

9 together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue

10 of material fact.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed.

11 R. Civ. P. 56(c)).

12         "Where the nonmoving party bears the burden of proof at trial, the moving party need

13 only prove that there is an absence of evidence to support the non-moving party's case."  <u>Nursing</u>

14 <u>Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.)</u>, 627 F.3d 376,

15 387 (9th Cir. 2010) (citing <u>Celotex Corp.</u>, 477 U.S. at 325); <u>see also</u> Fed. R. Civ. P. 56 advisory

16 committee's notes to 2010 amendments (recognizing that "a party who does not have the trial

17 burden of production may rely on a showing that a party who does have the trial burden cannot

18 produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment

19 should be entered, after adequate time for discovery and upon motion, against a party who fails to

20 make a showing sufficient to establish the existence of an element essential to that party's case,

21 and on which that party will bear the burden of proof at trial.  <u>Celotex Corp.</u>, 477 U.S. at 322.

22 "[A] complete failure of proof concerning an essential element of the nonmoving party's case

23 necessarily renders all other facts immaterial."  <u>Id.</u> at 323.

24         Consequently, if the moving party meets its initial responsibility, the burden then shifts to

25 the opposing party to establish that a genuine issue as to any material fact actually exists.  <u>See</u>

26 <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  In attempting to

27 establish the existence of such a factual dispute, the opposing party may not rely upon the

28 allegations or denials of its pleadings, but is required to tender evidence of specific facts in the

form of affidavits, and/or admissible discovery material in support of its contention that such a dispute exists.  See Fed. R. Civ. P. 56(c); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987), overruled in part on other grounds, Hollinger v. Titan Capital Corp., 914 F.2d 1564, 1575 (9th Cir. 1990).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts. . . .  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"  Matsushita, 475 U.S. at 586 (citation omitted).

3

By contemporaneous notice provided on May 3, 2014 (ECF No. 31), plaintiff was advised of the requirements for opposing a motion brought pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (*en banc*); Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

III.  Plaintiff's Claims

This action is proceeding on the amended complaint filed November 18, 2013, as to defendants Dr. Awatani, Dr. Baath and Physician Assistant Street.  (ECF No. 15.)  Plaintiff alleges that defendants denied him adequate medical care in violation of the Eighth Amendment.

*Claims Against Defendant Baath*

Plaintiff alleges that on April 30, 2013, he arrived at the Deuel Vocational Institution ("DVI").  (Id. at 5.)  Plaintiff alleges that on April 30, 2013, defendant Baath discontinued plaintiff's medication Artane, which had been prescribed to treat side effects from antipsychotic medications plaintiff had been taking, such as Abilify.  (Id.)  Plaintiff alleges that he had been taking Artane "for years."  (Id.)  Plaintiff alleges that after the Artane was discontinued, he suffered lockjaw as a side effect from the Abilify.  (Id. at 6.)  Plaintiff alleges that he was given Benadryl injections and pills over three days to treat the lockjaw.  (Id.)

*Claims Against Defendants Awatani and Street*

Plaintiff alleges that upon his arrival at DVI, defendants Awatani and Street changed the medications he had been taking for seizures and pain.  (Id. at 7.)  Plaintiff alleges that when he arrived at DVI, defendants discontinued Gabapentin, aka Neurontin and Phenobarbital, which he had been taking for seizures and pain.  (Id.)  Plaintiff also alleges that he was denied Norco and Flexeril for pain. (Id. at 7-8.)  Plaintiff alleges that as a result of experiencing extreme pain, he suffered from night sweats, nausea, vomiting and diarrhea.  (Id. at 8.)

Plaintiff alleges that he later met with defendant Awatani and requested that he be prescribed Phenobarbital and Gabapentin.  (Id.)  Defendant Awatani denied his request for reinstatement of these drugs.  (Id.)  Two days later, plaintiff met with defendant Street.  (Id.)  Plaintiff alleges that defendant Street discontinued plaintiff's Dilantin, which he had been taking for seizures.  (Id.)

4

1   Plaintiff alleges that on July 21, 2013, i.e., two weeks after his seizure medication was

2   discontinued, he had a seizure.  (Id.)

3   IV.  Legal Standard for Eighth Amendment Claims

4   To succeed on an Eighth Amendment claim predicated on the denial of medical care, a

5   plaintiff must establish that he had a serious medical need and that the defendant's response to

6   that need was deliberately indifferent.  Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006); see

7   also Estelle v. Gamble, 429 U.S. 97, 106 (1976).  A serious medical need exists if the failure to

8   treat the condition could result in further significant injury or the unnecessary and wanton

9   infliction of pain. Jett, 439 F.3d at 1096.  Deliberate indifference may be shown by the denial,

10  delay or intentional interference with medical treatment or by the way in which medical care is

11  provided.  Hutchinson v. United States, 838 F.2d 390, 394 (9th Cir. 1988).  To act with deliberate

12  indifference, a prison official must both be aware of facts from which the inference could be

13  drawn that a substantial risk of serious harm exists, and he must also draw the inference.  Farmer

14  v. Brennan, 511 U.S. 825, 837 (1994).  Thus, a defendant is liable if he knows that plaintiff faces

15  "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures

16  to abate it."  Id. at 847.  "[I]t is enough that the official acted or failed to act despite his

17  knowledge of a substantial risk of serious harm."  Id. at 842.

18  A physician need not fail to treat an inmate altogether in order to violate that inmate's

19  Eighth Amendment rights.  Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989).  A

20  failure to competently treat a serious medical condition, even if some treatment is prescribed, may

21  constitute deliberate indifference in a particular case.  Id.

22  It is well established that mere differences of opinion concerning the appropriate treatment

23  cannot be the basis of an Eighth Amendment violation.  Jackson v. McIntosh, 90 F.3d 330, 332

24  (9th Cir. 1996); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

25  V.  Defendants' Motion—Discontinuation of Artane

26  Plaintiff alleges that defendant Baath's failure to prescribe Artane caused him to suffer

27  lockjaw.  Put another way, plaintiff is claiming that when he arrived at DVI on April 30, 2013,

28  defendant Baath should have either prescribed another drug to replace the Artane or discontinued

5

1   Abilify.

2           Defendants argue that defendant Baath did not act with deliberate indifference to

3   plaintiff's serious medical needs when he discontinued plaintiff's prescription for Artane.  In

4   support of this argument, defendants submitted defendant Baath's declaration.  Defendant Baath

5   states, in relevant part,

> 1.  At all times relevant to this matter, I was a psychiatrist licensed to practice medicine in the State of California.  I was one of the doctors at Deuel Vocational Institution (DVI) who provided mental health treatment to Plaintiff Floyd Espey during his incarceration there between April 2013 and November 2013.

> 2.  On April 30, 2013, Plaintiff was transferred from Shasta County Jail to DVI.   (Initial Health Screening, ECF No. 73-4 at 8.)  [Footnote omitted.]  While housed at Shasta County Jail, Plaintiff was on a regimen of psychiatric medications to treat bi-polar disorder and depression, including Lithium, Carbonate, Effexor, Abilify and Artane.   (Medication Administration Record, April 2013, ECF No. 73-4 at 6-7.)

> 3.  Like any anti-psychotic medication, Ability has potential side effects, including extrapyramidal effects, whether it is taken alone or in conjunction with other medications.  However, it may be prescribed with other medications to counteract potential extrapyramidal symptoms, including lockjaw.  Artane is one of many such medications.  Other drugs used in conjunction with Abilify include Cogentin, Vistaril and Benadryl.

> 4.  Upon his arrival at DVI, Plaintiff's psychiatric medications were ordered, pending an evaluation in the mental health clinic. (Physician's Order, dated April 30, 2013, ECF No. 73-4 at 9.) However, that same day, I was informed by the pharmacy that Artane was a banned medication as of April 1, 2013.  Therefore, I was required to discontinue it.  (Id.)  I recall offering Plaintiff Cogentin in its place, which plaintiff declined.  He declined Cogentin and also Vistaril at a subsequent visit with Dr. Newman. (Primary Care Provider Progress Notes, dated May 10, 2013, ECF No. 73-4 at 17.)

> 5.  On May 9, 2013, I saw Plaintiff for a psychiatry clinic visit. (Interdisciplinary Progress Note-General Psychiatry, dated May 9, 2013, ECF No. 73-4 at 16.)  Plaintiff reported a history of bipolar disorder and also a history of intermittent lockjaw.  [Footnote 2: Plaintiff did not report these symptoms during his examination with Physician Assistant Street that same day.]  (Id.)  However, he did not report other lockjaw symptoms, including pain, and I observed that he was able to talk without difficulty.  (Id.)  Although these inconsistencies made me question the veracity of Plaintiff's lockjaw claim, I discontinued his prescription for Abilify to rule out an extrapyramidal reaction to taking Abilify without Artane.

6

6.  Had Plaintiff experienced lockjaw as a result of not taking Artane, that symptom would have manifested within two days. Plaintiff did not report lockjaw symptoms to Physician Assistant Street when she examined him on May 9, 2013.

7.  On May 10, 2013, Plaintiff was seen by Dr. Newman for complaints of right jaw pain.  (Primary Care Provider Progress Notes, dated May 10, 2013, ECF No. 73-4 at 17.)  As Plaintiff reported a previous reaction to Cogentin and complained that he had tried Vistaril, which was ineffective, I submitted a non-formulary drug request for Benadryl to rule out an extrapyramidal reaction to Abilify.  (Nonformulary Drug Request, dated May 10, 2013, ECF No. 73-4 at 18.)  The request was approved.  (Id.)

8.  On May 24, 2013, Plaintiff returned to Dr. Newman, again with complaints of pain and swelling in his right jaw.  (Primary Care Provider Progress Notes, dated May 24, 2013, ECF No. 73-4 at 21.)  The diagnosis was cellulitis and an antibiotic was prescribed.  (Id.)

9.  I did not see Plaintiff again before his transfer to Pleasant Valley State Prison in November 2013.

10.  During each of my encounters with Plaintiff, it was my intention to address his mental health condition with medically necessary treatment.  I examined him, took his history, and reviewed and adjusted his psychiatric medications. I was not aware of any risk of serious medical harm to Plaintiff which would result from the course of treatment prescribed.

11.  Plaintiff did not suffer any adverse effect as a result of not being prescribed Artane upon his transfer to DVI.  His complaints of lockjaw were inconsistent with that condition and also inconsistent with his claim that he suffered extrapyramidal effects after I discontinued his prescription for Artane.

(ECF No. 89-3 at 1-3.)

In his declaration submitted in support of his opposition, plaintiff does not dispute the underlying facts set forth in defendant Baath's declaration.  (ECF No. 80.)  In particular, plaintiff does not dispute that Artane was discontinued on April 30, 2013.  (Id. at 10.)  Plaintiff states that on May 9, 2013, after seeing defendant Street, plaintiff began having "tight, painful, tension like movements" in his jaw that he could not control.  (Id. at 11.)  Plaintiff states that defendant Baath came to see him and discontinued Abilify.  (Id.)

Plaintiff alleges that on May 10, 2013, he had to go "man down" because of the lockjaw he was experiencing.  (Id.)  Plaintiff alleges that he ended up chipping and cracking a few of his back teeth due to this condition.  (Id.)  Plaintiff alleges that he was rushed to the infirmary.  (Id.)

1  Plaintiff alleges that he was given an injection of Benadryl and pills for 3 days.  (Id.)  Plaintiff

2  does not dispute that on May 23, 2014, he was diagnosed with cellulitis in his right lower jaw.

3  (Id. at 11-12.)

4        For the following reasons, the undersigned recommends that defendant Baath be denied

5  summary judgment.  First, while defendant Baath may have been prohibited from prescribing

6  Artane, it is unclear why defendant Baath did not discontinue plaintiff's prescription for Abilify

7  on April 30, 2013, when he discontinued plaintiff's Artane prescription.  Conversely, when

8  plaintiff declined Congentin to replace Artane, apparently because of a previous reaction, it is

9  also unclear why defendant Baath did not offer plaintiff Benadryl on April 30, 2013, or some

10  other drug, instead of Artane.[1]  The undersigned cannot determine whether defendant Baath acted

11  with deliberate indifference without knowing why he allowed plaintiff to continue taking Abilify,

12  without prescribing another drug to prevent lockjaw, which plaintiff claimed he had suffered in

13  the past.

14        Defendant Baath argues that he is entitled to summary judgment on grounds that plaintiff

15  suffered no adverse effect as a result of not being prescribed Artane.  In support of this argument,

16  defendant Baath refers to his declaration wherein he states that the symptoms of lockjaw would

17  have manifested themselves within two days of plaintiff not taking Artane, i.e., two days after

18  April 30, 2013.  In that case, then it is unclear why defendant Baath treated plaintiff for lockjaw

19  on May 10, 2013 by prescribing Benadryl, a non-formulary drug.  Defendant Baath does not state

20  whether the Benadryl alleviated any of plaintiff's symptoms.  Based on this record, the

21  undersigned cannot conclude that plaintiff suffered no adverse effect as a result of not taking

22  Artane.[2]

23

24    [1]  Defendant Baath did not offer plaintiff Vistaril on April 30, 2013.  However, plaintiff later

25  declined Vistaril because it had not been effective in the past.

26    [2]  Moreover, if plaintiff could not have had lockjaw on May 10, 2013, as a result of the
discontinuation of Artane on April 30, 2013, it is unclear why defendant Baath did not consider

27  other causes for plaintiff's symptoms.  On May 24, 2013, plaintiff was diagnosed with cellulitis in
his jaw.  It is unclear whether the pain plaintiff experienced on May 10, 2013 could have been

28  related to the cellulitis diagnosed 14 days later, a condition apparently unrelated to lockjaw.

1    Defendant Baath also argues that plaintiff manifested no symptoms of lockjaw, referring

2    to the symptoms plaintiff complained of on May 9, 2013.  However, it is undisputed that on May

3    10, 2013, plaintiff exhibited symptoms of lockjaw sufficient to warrant treating him for the

4    condition with a non-formulary medication.  In his declaration, plaintiff states that he had to go

5    "man down" on May 10, 2013 due to the symptoms of lockjaw he experienced.  Therefore, the

6    alleged fact that plaintiff experienced lockjaw symptoms on May 10, 2014, does not appear

7    disputed.  What is disputed is whether the symptoms were actually caused by lockjaw.  The

8    undersigned cannot make this determination based on the present record.

9    For the reasons discussed above, defendant Baath should be denied summary judgment.

10   VI.  <u>Defendants' Motion – Pain and Seizure Medication</u>

11      A.  <u>Undisputed Facts</u>

12   On April 30, 2013, plaintiff was transferred from the Shasta County Jail to DVI.  (ECF

13   No. 73-4 at 8.)  Whiled housed at the Shasta County Jail, plaintiff was on a regimen of

14   medications to treat pain and a seizure disorder including Neurontin (aka Gabapentin), Dilantin,

15   Zantac, Phenobarbital, Norco and Flexeril.  (<u>Id.</u> at 6-7.)

16   Upon plaintiff's transfer to DVI, plaintiff received new prescriptions for Gabapentin,

17   Phenobarbital, Dilantin and Zantac.  (<u>Id.</u> at 10.)  Plaintiff did not receive new prescriptions for

18   Norco and Flexeril, which he had been taking for back pain.  (<u>Id.</u>)  A doctor, who is not named as

19   a defendant in this action, made these decisions regarding plaintiff's prescriptions for Norco and

20   Flexeril.  (<u>Id.</u>)

21   On May 6, 2013, plaintiff was prescribed Tylenol for musculoskeletal pain by a health

22   care professional who is not named as a defendant.  (<u>Id.</u> at 11.)

23   On May 9, 2013, defendant Street, a physician's assistant, first saw plaintiff for his initial

24   intake examination.  (<u>Id.</u> at 12-13.)  Plaintiff reported a history of back pain and the fact that he

25   had taken Gabapentin for that pain.  (<u>Id.</u> at 12-13.)  In her notes, defendant Street wrote that

26   plaintiff told her that he had experienced chronic back pain since 2008 when he was stomped on

27   the back.  (<u>Id.</u>)  Plaintiff informed defendant Street that he had been told that he had a herniated

28   disc.  (<u>Id.</u>)  Defendant Street suspected that plaintiff was malingering and decided to taper

1   plaintiff off Gabapentin.  (Id. at 13.)  Her notes from the exam state that plaintiff got on the exam

2   table slowly.  (Id.)  However, there was no evidence of atrophy, plaintiff was able to bend over in

3   a sitting position and to pull his pant legs up.  (Id.)  Defendant Street wrote that plaintiff's gait

4   was strong and steady.  (Id.)  Defendant Street renewed plaintiff's Tylenol prescription.  (Id.)

5       During this examination, plaintiff also reported that he had been taking Phenobarbital and

6   Dilantin for seizures.  (Id. at 12-13.)  Defendant Street continued plaintiff's prescription for

7   Dilantin, but tapered plaintiff off Phenobarbital because it was non-formulary.  (Id.; ECF No. 89-

8   4 at 2.)  A non-formulary medication is one that cannot be prescribed without prior approval by

9   the Chief Physician and Surgeon.  (ECF No. 89-4 at 2.)  Defendant Street prescribed Tegretol in

10  the place of Phenobarbital.  (Id.; ECF No. 73-4 at 13.)

11      Defendant Dr. Awatani first saw plaintiff on June 3, 2013, for complaints of back pain.

12  (ECF No. 73-4 at 25.)  Dr. Awatani wrote that plaintiff told him that he had a herniated disc.  (Id.)

13  By that date, plaintiff had been taken off of Gabapentin, Phenobarbital, Norco and Flexeril.  (ECF

14  No. 89-2 at 2.)  Plaintiff requested Morphine and Gabapentin for pain.  (ECF No. 73-4 at 25.)  Dr.

15  Awatani wrote that he observed no muscle atrophy nor clinical evidence of radiculopathy.  (Id.)

16  Defendant Awatani continued plaintiff's prescription for Tylenol and did not prescribe any

17  additional pain medication.  (Id.)  Dr. Awatani wrote that plaintiff was upset that he would not

18  receive Morphine and Gabapentin and that plaintiff "jumped off the exam table and walked out of

19  the clinic with surprising speed."  (Id.)

20      Plaintiff has provided medical records demonstrating that he was seen on July 2, 2013,

21  complaining that he aggravated his chronic low back pain after falling.  (ECF No. 80-1 at 26.)

22  The health care professional who examined plaintiff, i.e., not a defendant, wrote that plaintiff

23  required support, apparently to walk.  (Id.)  Although difficult to read, it appears that the notes

24  from the examiner state that plaintiff was focused on medication.  (Id.)  The notes also state that

25  "per RN no gross deformity...moves LE ok.  No gross new findings..."  (Id.)  It does not appear

26  that any new medication was prescribed.  (Id.)

27      Plaintiff has also provided medical records demonstrating that he was seen on July 4,

28  2013, for complaints of back pain.  (Id. at 30.)  Plaintiff reported that he fell after his legs gave

out on him.  (Id.)  The notes from the nurse who examined plaintiff are difficult to read.

However, it appears that the nurse did not prescribe the medication plaintiff requested and that

plaintiff was not happy about it.  (Id.)

Defendant Awatani next saw plaintiff on July 8, 2013, in connection with plaintiff's

grievance regarding the denial of Phenobarbital and Gabapentin, which plaintiff claimed had been

prescribed to treat grand mal seizures.  (ECF No. 73-4 at 40.)  Defendant Awatani  told plaintiff

that he would not prescribe these medications because they were non-formulary and because

Gabapentin was not indicated for grand mal seizures.  (Id. at 40.)  Defendant Awatani renewed

plaintiff's prescription for Dilantin.  (Id.)  Dr. Awatani noted that plaintiff had reported no

seizures since his arrival at DVI on April 30, 2013.  (Id.)

Defendant Street next saw plaintiff on July 11, 2013, for complaints of low back pain.

(Id. at 39.)  Defendant Street renewed plaintiff's Tylenol prescription and ordered a lumbar x-ray.

(Id.)  Defendant Street's notes state that plaintiff again reported that he had a herniated disc.  (Id.)

Defendant Street also reviewed plaintiff's lab results, which reflected elevated liver enzymes.

(Id.)  Based on this change in liver enzymes, defendant Street changed plaintiff's seizure

medication from Dilantin to Keppra.  (Id.)

On July 14, 2013, plaintiff was transported and admitted to San Joaquin General Hospital

to rule out a spinal fracture after he fell during a reported seizure.  (Id. at 41.)  Attached to

plaintiff's opposition is a copy of a report of the CT taken of plaintiff's lumbar spine at the

hospital on July 15, 2014.  (ECF No. 80-1 at 18.)  The report states,

> Lumbar Spine CT:  The alignment and mineralization appear normal.  Disc heights appear well preserved.  No significant disc bulges or protrusions.  There is a bilateral spondylolysis at L4 without spondylolisthesis.  Spina bifida occulta is noted at L5 through the sacrum.  Visualized portions of the sacrum are normal. Paraspinal soft tissues are normal.
>
> Conclusion:  Bilateral spondylolysis at L4 without spondylolisthesis.  No acute abnormality.  Spina bifida occulta L5 through the sacrum.

(Id.)

Plaintiff has submitted records from July 15, 2013, when he sought treatment for back

pain following his return from the hospital.  (Id. at 45.)  The notes from the nurse who examined

plaintiff indicate that plaintiff complained of pain caused by the fall following his seizure on July

14, 2013.  (Id.)  Plaintiff requested pain medication.  (Id.)  The nurse wrote that plaintiff was able

to get out of the gurney and walk into the clinic with a steady gait.  (Id.)   Tylenol was prescribed.

(Id.)

Plaintiff has also submitted records from July 17, 2013, when he again sought medication

for back pain caused by the fall following his seizure on July 14, 2013.  (Id. at 49.)  Plaintiff

requested morphine.  (Id.)  The notes from the health care professional who examined him state

that plaintiff was able to ambulate well.  (Id.)  Although difficult to read, it appears that plaintiff

did not have any obvious injury to his back.  (Id.)  Robaxin was prescribed.  (Id.)  Robaxin is a

muscle relaxant.  See http://www.drugs.com/robaxin.html.

Plaintiff was taken to San Joaquin General Hospital again on July 23, 2013, to rule out

head trauma after suffering a second seizure.  (ECF No. 73-4 at 42-45.)  The report from this

exam states that, "According to witness, seizure was for four minutes and can be categorized as

generalized tonic-clonic."  (Id. at 42.)  The results of a chest x-ray, CT of plaintiff's head without

contrast, CT of facial bones without contrast and shoulder x-ray were negative.  (Id. at 46.)  The

report from the hospital also stated that plaintiff's Dilantin levels were checked and came back

low.  (Id.)  The notes from the hospital listed Dilantin and Keppra as plaintiff's discharge

medications.  (Id. at 48.)

On August 21, 2013, plaintiff underwent a neurological evaluation at San Joaquin General

Hospital.  (Id. at 76.)  The report by Dr. Remler, who performed the examination, states in

relevant part:

> HISTORY OF PRESENT ILLNESS:  The patient is seen in
> followup neurology consultation having been previously seen
> during his admission at San Joaquin General on 7/23 to 07/24/2013
> for a seizure and a fall.  He gives a history that he had been
> previously well managed with phenobarbital and gabapentin prior
> to his incarceration, but since those were discontinued he is having
> these frequent seizures.  A CT scan was performed on 07/23/2013,
> which was normal.  An EEG was performed, I do not have the EEG
> number, which showed a large amount of artifact but was otherwise
> normal.  A CT of the spine was performed on 07/23/2013, which
> was also normal.  His examination in the hospital and briefly again

today was neurologically normal.  Since these seizures have started, he has been on Dilantin and Keppra, and not put back on phenobarbital or the gabapentin.

DISCUSSION:  Given the normal EEG and the substantial dose of effective antiepileptics, the possibility of psuedoseizures versus seizures must be considered.  At this point in time, the options are to send him to an epilepsy center for video monitoring off all medication, or we can continue to try to manage him on an outpatient basis with recurrent blood levels of his medication and a repeat EEG, hopefully with less artifact.  My inclination is toward the latter, and my inclination is towards a diagnosis of psuedoseizures, but of course that cannot be made definitively at this time.

(Id.)

On September 19, 2013, defendant Awatani referred plaintiff for a repeat EEG.  (Id. at 77.)  Plaintiff refused this appointment.  (Id. at 78.)  The appointment was rescheduled for October 23, 2013, which plaintiff also refused.  (Id. at 80, 82.)

On November 4, 2013, defendant Awatani referred plaintiff for an appointment at the epilepsy center.  (Id. at 82.)  However, plaintiff was transferred to Pleasant Valley State Prison ("PVSP") on November 7, 2013.  (ECF No. 89-2 at 4.)

On November 14, 2013, plaintiff was examined by Dr. Chokatos at PVSP.  (Id. at 86-88.)  Dr. Chakatos made the following observations regarding plaintiff's complaints of back pain:

NEUROLOGIC/ORTHOPEDIC:  Directed towards the evaluation of the complaint of low back pain revealed the patient had no evidence of scoliosis.  He had full range of motion and was able to bend over and put on his shoes from a standing position.  The patient demonstrated local tenderness at the left superior iliac spine at about the level of L-5-S1.  He had pain with truncal rotation.  He had marked pain with axial loading all localized to that same area to the left spine.  Straight leg raising test was negative to 90 degrees in the sitting position, but on recumbency, the straight leg raising test was positive on the left at about 45 degrees, but was negative on the right.  Following the straight leg raising maneuver, the patient was able to sit bolt upright with both legs outstretched without difficulty at all.  In summary, the patient had no orthopedic abnormalities, whereas he had a 4/5 nonphysiologic signs of pain.

****

ASSESSMENT AND PLAN

****

13

3.  Chronic pain syndrome, low back pain.  The examination as above and the patient's pain documentation, when he filled out the initial questionnaire, does not indicate that he has a condition which is based on other disc or neuropathic disease.   No further investigation of this problem will be undertaken at this time.  His medication for pain will remain as it is.

(Id. at 87-88.)

Plaintiff had been taking Tylenol for pain.  (Id. at 88.)

Regarding plaintiff's seizures, Dr. Chokatos' report states,

HISTORY OF PRESENT ILLNESS:  The patient, a 29 year old male, a new arrival presented with the chief complaint of "psuedoseizures."  The patient states that he had been epileptic for years commencing with his wife's death and subsequent emotional stress 9 years ago.  He started using substances at that time and developed seizures.  He describes these episodes as episodes of unconsciousness with tonic/clonic seizures.  They begin with scintillating scotomata at which point he loses consciousness.  The patient stated that his best control of seizures had been with the drugs gabapentin and phenobarbital.  Later, other drugs were added to this regimen instead of these and he felt the results were less than satisfying.   The drugs used to substitute for gabapentin and phenobarbital were Dilantin and levetiracetam.  Neither of these, in his opinion, provided as good of control as he had previously.  He had been admitted to the hospital at San Joaquin General Hospital in July 2013 at which time he had imaging by CT scan of his paranasal sinuses and the face, of the cervical and thoracic spine and of the skull.  All of these studies were negative. A chest film was normal.  A maxillofacial CT showed no injury.  A CT of the head and neck was unremarkable.  The patient was examined by physicians.  History was obtained that he had had seizures since he was a child and that only gabapentin and phenobarbital controlled his generalized seizures.   The patient stated in the physical examination of 07/23/2013 that since he had become incarcerated the medicine had been discontinued and he had had multiple seizures since.  His seizures, according to witnesses who reported to the patient, are generalized clonic/tonic events with no history of bladder or bowel sphincter loss, but the patient stated, "I did bite my tongue."  His anticonvulsant levels were subtherapuetic.  He revealed today that he had not taken his levetiracetam for weeks, stating he did not want to wait for it in the pill line since he did not think it worked.  The 12/23/2013 admission was prompted by the development of a laceration over his right eye and a fall which is interpreted as epileptic in nature.

The patient was subsequently, after discharge, seen by Neurology.  An EEG was performed on 08/15/2013.  At that time the patient was on phenytoin, acetaminophen, lithium and venlafaxine.  The EEG interpretation was "probably normal EEG."  The interpretation was significantly limited by artifact.

14

Because of the artifact, the consultant neurologist wished to see this patient again and perform another EEG under better conditions. The patient refused to go see this neurologist on 09/25/2013. A repeat EEG was scheduled for 10/23/2013, but the patient refused. He stated he wanted something to be done about my seizures and that he wanted his medication back (phenobarbital and gabapentin). He wanted to go to an "Epilepsy Center" as suggested by his neurologist. He also threatened a lawsuit at that time. The reason he is threatening a lawsuit is because his internist at the time had stopped his phenobarbital and Neurontin and instead was using 2 drugs he did not think were appropriate, Dilantin and levetiracetam.

The patient stopped taking his levetiracetam about 2 weeks ago.

It is noteworthy that the blood levels of anticonvulsants which were obtained and had been subtherapeutic before he stopped taking his levetiracetam on his own.

The onset of seizures was inconsistent. He said he fell off a roof at age 18 and this caused him to have lumbar pain. In a hospitalization he said he had seizures since he was a child, and now he is telling us that he had them only after the trauma of seeing his wife killed.

****

ASSESSMENT AND PLAN

1.   Non-epileptic paroxysmal neurologic events. The patient's presence of a negative EEG, the alleged control of general generalized events to the use of gabapentin and phenobarbital is highly suspicious. The patient's failure to demonstrate positive EEG findings is nearly confirmatory, but the tracing was too full of artifact to be reliable. In any case, the patient's continued insistence on having these 2 drugs renewed suggests that his needs are not determined by the lack of control of neurologic events. In addition, there is an inconsistency in regard to the history. On the one hand, he states his events began with the death of his wife. On the other hand, he says he has had them all of his life. At the present time, the patient is not taking his levetiracetam and it will be discontinued. The phenytoin will continue and further evaluation is not planned at this time.

(Id.)[3]

B.   Clarification of Preliminary Matters

*Plaintiff's Claims*

At the outset, the undersigned clarifies plaintiff's claims.

////

_____

[3]  Levetiracetam is Keppra. Phenytoin is Dilantin.

15

1    Plaintiff alleges that Gabapentin and Phenobarbitol were the only drugs effective in

2    treating his seizure disorder.  Plaintiff alleges that defendants' substitution of other anti-seizure

3    drugs in place of Gabapentin and Phenobarbital caused him to suffer two seizures in July 2013.

4    With regard to pain medication, plaintiff alleges that defendants failed to treat his *chronic*

5    back pain which he suffered from when he arrived at DVI.  Plaintiff's medical records indicate

6    that he complained of back pain resulting from the falls he suffered during his seizures.

7    However, the gravamen of plaintiff's claim alleging inadequate pain medication concerns

8    treatment of his chronic back pain, rather than pain caused by injuries following his transfer to

9    DVI.

10    *Plaintiff's Conditions That Medications Were Prescribed to Treat*

11    It is undisputed that Norco and Flexeril were prescribed to treat plaintiff's back pain.  It is

12    also undisputed that Phenobarbital was prescribed to treat plaintiff's seizures.

13    The issue of whether Gabapentin was prescribed to treat plaintiff's pain, seizures, or both,

14    is less clear.  In the amended complaint, plaintiff alleges that Gabapentin was prescribed to treat

15    both conditions.  This allegation is not inconsistent with what plaintiff told defendants, as

16    reflected in the medical records.  In contrast, defendants claim that Gabapentin was prescribed for

17    pain and not as an anti-seizure medication.  (See ECF No. 89-2 at 2, Awatani declaration.)

18    According to defendant Awatani, Gabapentin was not "indicated" for grand mal seizures. (Id.)

19    However, in response to an earlier request for injunctive relief filed by plaintiff, defendants

20    submitted the declaration of Dr. Fox, the Chief Physician at DVI.  (ECF No. 14-1.)  According to

21    Dr. Fox, Gabapentin is used to treat both epilepsy and pain.  (Id. at 14-1 at 2.)

22    Defendants submitted conflicting opinions regarding what conditions Gabapentin may

23    treat.  For that reason, the undersigned finds that defendants have failed to demonstrate that

24    Gabapentin was not an anti-seizure medication.  Accordingly, the undersigned finds that, for

25    purposes only of this summary judgment motion, Gabapentin was prescribed to treat plaintiff's

26    back pain and seizure disorder.

27    ////

28    ////

*When Plaintiff's Medications Were Prescribed*

The undersigned next clarifies when plaintiff's pain and seizure medications were prescribed following his transfer to DVI.  It is undisputed that plaintiff's prescriptions for Norco and Flexaril, which he had been receiving at the Shasta County Jail, were discontinued upon plaintiff's arrival at DVI on April 30, 2013.

It is undisputed that on May 6, 2013, plaintiff was prescribed Tylenol for back pain.

It is undisputed that on May 9, 2013, defendant Street began tapering off plaintiff's Gabapentin.  The tapering off period was ten days, i.e., ending on approximately May 19, 2013.  (ECF No. 73-4 at 15.)

It is undisputed that on May 9, 2013, defendant Street also began tapering off plaintiff's prescription for Phenobarbital and replaced this prescription with Tegretol.  It is unclear when the tapered off prescription for Phenobarbital ended.

It is undisputed that on July 11, 2013, defendant Street discontinued plaintiff's prescription for Dilantin and replaced it with Keppra.  However, the undersigned observes that at some point, plaintiff's Dilantin prescription was reinstated, perhaps after being re-prescribed by the doctors who saw plaintiff at the hospital following his second seizure on July 23, 2013.

C. Defendants' Statements

At the conclusion of their declarations, defendants each state that they treated plaintiff appropriately.  The undersigned sets forth these statements herein.  Defendant Awatani states,

> 14.   During each of my encounters with Plaintiff, it was my intention to address his medical conditions with medically necessary treatment.   I examined him, took his history, and reviewed and adjusted his medications for back pain and seizures.  Regarding his back pain, Plaintiff got off the examination table without limitations and walked with surprising speed out of my office.   Regarding his seizures, he was diagnosed with pseudo-seizures by the doctors at San Joaquin General Hospital. Dr. Chokatos at Pleasant Valley State Hospital questioned whether Plaintiff suffered from seizures or pseudo-seizures, noting Plaintiff's continued insistence on specific medications.  In treating Plaintiff's medical conditions, I was not aware of any risks of serious medical harm to Plaintiff which would result from the course of treatment I prescribed.

(ECF No. 89-2 at 5.)

17

1    In her declaration, defendant Street states,

2            11.  In treating Plaintiff's medical conditions, I was not aware of
         any risks of serious medical harm to Plaintiff which would result
3        from the course of treatment I prescribed.  During each of my visits
         with Plaintiff, it was my intention to address his medical conditions
4        with medically necessary treatment.  I examined him, took his
         history, and reviewed and adjusted his medications for back pain
5        and seizures.  I ordered diagnostic studies for his back pain and
         renewed his prescription for Tylenol despite my suspicion that he
6        was malingering and focused on getting pain medication.  I also
         ordered blood work and adjusted his seizure medication, which was
7        appropriate, given the fact that he did not report any seizures in the
         first three months he was at DVI, despite his repeated refusal to
8        take prescribed medications.

9    (ECF No. 89-4 at 4.)

10           D.  Supplemental Briefing re:  Seizure Medication

11           On July 1, 2015, the undersigned directed the parties to file further briefing regarding

12   plaintiff's seizure medications.  (ECF No. 92.)  In this order, the undersigned observed that

13   neither party had filed any expert evidence addressing the effectiveness of the drug combinations

14   prescribed in place of Gabapentin and Phenobarbital, i.e., Dilantin and Tegretol, and Keppra and

15   Tegretol.  (Id. at 3-4.)  The parties were granted fourteen days to file further briefing regarding

16   the effectiveness of these drug combinations.  (Id. at 4.)  Plaintiff did not file any briefing in

17   response to this order.

18           On July 15, 2015, defendants filed the supplemental declaration of Dr. Fox.  (ECF No. 94-

19   1.)  In his supplemental declaration Dr. Fox states, in relevant part,

20           1.  I was the Chief Physician and Surgeon at Deuel Vocational
         Institution in Tracy, California until I retired in December 2014.
21       After I retired, I returned to work as a part-time staff physician for
         Healthy Beginnings, Inc., a methadone treatment clinic at their
22       satellite clinic in Manteca, California, where I currently work.

23           2.  In 2013, at the request of the Attorney General's Office, I
         reviewed the medical records of Floyd Joseph Espey (CDCR #G-
24       23601) and provided a declaration concerning his allegations that
         he was denied seizure and pain medications.  I provide this
25       declaration also at the request of the Attorney General's Office.

26           3.  I have been provided a copy of Espey's medical records that
         were filed with the Court  (ECF No. 73-4) and have reviewed them
27       in preparing this declaration.

28           4.  The medications Dilantin, Tegretol, and Keppra are all central-

18

nervous system depressants, meaning that they help suppress the hyperactive firing of neurons that causes epileptic seizures. Any combination of these medications can be equally as effective as Gabapentin and Phenobarbital in treating seizures. In my previous declaration, I stated that Keppra and Dilantin, taken together, are equally as effective in treating Espey's seizure disorder as Gabapentin and Phenobarbital. Additionally, Dilantin and Tegretol in combination, and Keppra and Tegretol in combination, are equally as effective as Gabapentin and Phenobarbital in treating seizures.

5. The only way to find out which medications or combination of medications works best is by conducting clinical trials with the individual patient. Dilantin is generally the first medication that doctors try for seizure management. If the patient still experiences seizures while on Dilantin, for example, the treating physician will generally increase the dosage of the first medication and add a second medication, such as Tegretol or Keppra.

6. Regarding how much time is needed to gauge the effectiveness of anti-seizure medications, it usually takes three to five days for anti-seizure medications to reach a steady level in the patient's blood and tissues, with some variability depending upon the individual and the particular medication(s) being used. Effectiveness is gauged by the cessation of documented seizure activity and the reduction or elimination of observed seizure events. Thus, it is possible to determine the effectiveness of a particular medication or combination of medications within three to five days.

7. Psuedo seizures are distinguishable from true seizures. Psuedo seizures is not a condition that requires the prescription of anti-seizure drugs. Rather, the term pseudo seizures is most often used in the medical field to distinguish feigned seizures from true seizures. I stated in my previous declaration that unlike true seizures, pseudo seizures are not accompanied by observable electrical activity and may be caused by a psychological response to some process or by a patient fabricating seizure symptoms. In other words, pseudo seizures are either purely psychological or they are purposefully feigned by the patient.

8. True seizures typically result in loss of consciousness, tonic-clonic activity (convulsions), cessation of breathing, clenching of the jaw and teeth, and incontinence of urine and/or feces. After the patient regains consciousness, he will typically experience what is called a "post-ictal" state, which is characterized by sleepiness, confusion, and incoherence for approximately thirty minutes to an hour after the seizure. Sometimes the patient will have no memory of the seizure.

9. Although it cannot be determined definitely, Espey's medical records show that his diagnosis was towards pseudo-seizures rather than a true seizure disorder. (ECF No. 73-4 at 76.) In particular, Espey's neurological examination of August 21, 2013, showed no objective evidence of seizure disorder. (Id.) Specifically, the consulting physician noted a normal head CT and normal EEG

1
2

although with considerable artifact.  (Id.)  Artifact refers to external muscle movements that would not indicate epileptic or seizure activity in the brain.

3
4
5
6
7
8
9
10
11
12

10.  Although Espey was admitted to San Joaquin General Hospital for reported seizures on July 14 and 23, 2013, respectively, there is no objective evidence to corroborate that he actually suffered seizures on those dates.  Espey's hospitalization records for those two dates only show that he complained of having suffered seizures and reported himself that he had a history of seizures.  (ECF No. 73-4 at 41-48.)  Specifically, on July 14, 2013 Espey was admitted to San Joaquin General Hospital, where it was noted in the "Patient Statement" section, "Status post fall after seizure [question mark]." (ECF No. 73-4 at 41.)  Similarly, on July 23, 2013, Espey was admitted to San Joaquin General Hospital for the chief complaint of "seizure and subsequent fall."  (ECF No. 73-4 at 42.)  However, his medical records do not contain any written indication of a true seizure or post-ictal signs as discussed above, observed by any provider that would indicate that he suffered a true seizure on those dates.  For instance, a review of his systems on July 23, 2013, showed that he was negative for incontinence and negative for biting of tongue.  (Id.)

13
14
15

11.  In my medical opinion, the decisions to taper Espey off the restricted medications Gabapentin and Phenobarbital, and prescribing alternate combinations, including the specific combinations of Dilantin and Tegretol in combination, and then Keppra and Tegretol in combination, were appropriate and were entirely within the standard of care.

16

(ECF No. 94-1 at 1-4.)

17

　　D.  Analysis

18

　　　Defendants concede that there is a genuine factual dispute as to whether plaintiff's chronic

19

back pain and seizure disorder constituted serious medical needs.  (ECF No. 73-2 at 10.)

20

Defendants argue that they did not act with deliberate indifference with respect to their treatment

21

of plaintiff regarding these conditions.

22

　　　*Pain Medication*

23

　　　With regard to plaintiff's back pain, defendants argue that their decisions to prescribe

24

Tylenol in place of Norco and Flexeril, and the other pain medications plaintiff requested, were

25

based on their observations of plaintiff.  Defendants note defendant Awatani's June 3, 2013

26

examination of plaintiff when she observed plaintiff jump off the exam table then walk quickly

27

out.  In addition, after examining plaintiff on May 9, 2013, defendant Street concluded that

28

plaintiff was malingering.  Based on these observations, defendants determined that plaintiff did

1    not require any pain medication other than Tylenol.

2            As discussed above, after examining plaintiff, Dr. Chokatos at PVSP concluded that

3    plaintiff did not have a condition that was based on either other disc or neuropathic disease.  Dr.

4    Chokatos also concluded that plaintiff required only Tylenol for his back pain.

5            Plaintiff has not provided evidence demonstrating that he had a chronic back injury that

6    caused the pain he alleges he suffered.  In his opposition, plaintiff refers to his exhibits P-1, P-2

7    and P-3 as containing medical records of the injury that resulted in his chronic back pain.  (See

8    ECF No. 80-1 at 11-13.)  These records contain a report of x-rays of plaintiff's chest and ribs on

9    July 8, 2010.  (Id. at 11.)  The x-rays were taken after plaintiff was kicked multiple times.  (Id.)

10   The findings indicated that plaintiff had several rib fractures.  (Id.)  The other records include a

11   medical record from October 29, 2010, when plaintiff complained of back pain as a result of an

12   altercation.  (Id. at 12.)  The October 29, 2010 record indicates that plaintiff was prescribed

13   Ibuprofen and his condition on release was "stable."  (Id.)  Plaintiff also provides a medication

14   record from October 21, 2010, stating that he was prescribed morphine, in addition to other

15   medication.  (Id. at 13.)  This record does not describe the condition the morphine was prescribed

16   to treat.

17           The records described above do not demonstrate that plaintiff had a back injury that

18   caused him to suffer chronic pain when he arrived at DVI on March 30, 2013.  Even assuming

19   plaintiff suffered a back injury in 2010, plaintiff has provided no evidence that the injury he

20   suffered in 2010 caused him to suffer chronic pain, warranting the type of pain medication he

21   sought following his transfer to DVI on March 30, 2013.

22           Based on the record described above, the undersigned finds that defendants' decisions

23   regarding the type of pain medication required to treat plaintiff's chronic back pain, including

24   Gabapentin, do not reflect a conscious disregard of plaintiff's serious medical needs.  Defendants

25   made their decisions to prescribe Tylenol after examining plaintiff and reviewing his medical

26   records.  Dr. Chokatos, who evaluated plaintiff after his transfer to PVSP, agreed with defendants

27   that Tylenol adequately treated plaintiff's back pain.  Based on this record, defendants' refusal to

28   provide plaintiff with the pain medication he preferred did not rise to the level of deliberate

1   indifference in violation of the Eighth Amendment.  See McGuckin v. Smith, 974 F.2d 1050  (9th

2   Cir 1992) (a defendant "must purposefully ignore or fail to respond to a prisoner's pain or

3   possible medical need in order for deliberate indifference to be established."); see also Parlin v.

4   Sodhi, 2012 WL 5411710 at *4 (C.D. Cal. Aug. 8, 2012) ("At its core, Plaintiff's claim is that he

5   did not receive the type of treatment and pain medication that he wanted when he wanted it.  His

6   preference for stronger medication—Vicodin, Tramadol, etc.,—represents precisely the type of

7   difference in medical opinion between a lay prisoner and medical personnel that is insufficient to

8   establish a constitutional violation."); Tran v. Haar, 2012 WL 37506 at *3–4 (C.D. Cal. Jan. 9,

9   2012) (plaintiff's allegations that defendants refused to prescribe "effective medicine" such as

10  Vicodin and instead prescribed Ibuprofen and Naproxen reflected a difference of opinion between

11  plaintiff and defendants as to the proper medication necessary to relieve plaintiff's pain and failed

12  to state an Eighth Amendment claim); Ruiz v. Akintola, 2010 WL 1006435 at *7 (E.D. Cal. Mar.

13  17, 2010) (granting summary judgment in favor of defendants on plaintiff's inadequate medical

14  care claim where he presented no expert evidence that the Ultram which defendants prescribed,

15  instead of the Norco that U.C. Davis physicians had recommended, was not medically warranted

16  or reasonable), aff'd No. 10–16516 (9th Cir. Nov. 2, 2011).  For these reasons, defendants should

17  be granted summary judgment as to plaintiff's claim alleging that they failed to prescribe

18  adequate pain medication.

19       *Seizure Disorder*

20       For the reasons stated herein, the undersigned finds that defendants should be granted

21  summary judgment as to plaintiff's claim that they wrongly discontinued his prescriptions for

22  Gabapentin and Phenobarbital to treat his seizure disorder.

23       The undisputed evidence, set forth above, demonstrates that defendants' decisions to deny

24  plaintiff's requests for Gabapentin and Phenobarbital were based on the fact that these drugs

25  were non-formulary, meaning they could not be prescribed without prior approval of the Chief

26  Physician and Surgeon.  In his previously submitted declaration, Dr. Fox explained that the use of

27  Gabapentin and Phenobarbital was restricted by CDCR because of the high potential for misuse

28  ////

22

by inmates with substance abuse problems.[4]  (ECF No. 14-1 at 2.)  This fact apparently explains why these two drugs were classified as non-formulary.

Defendants also submitted undisputed expert evidence, i.e., Dr. Fox's supplemental declaration, that the drug combinations prescribed to replace Gabapentin and Phenobarbital were within the standard of care.  According to Dr. Fox, these drug combinations can be equally as effective as Gabapentin and Phenobarbital in treating seizures.

Defendants' decision to substitute the combinations of Dilantin and Tegretol, and then Tegretol and Keppra, for Gabapentin and Phenobarbital, did not constitute deliberate indifference.  Defendants chose to substitute the new drugs because the use of Gabapentin and Phenobarbital had been restricted because of the high potential for misuse by inmates.  Because the drug combinations substituted for Gabapentin and Phenobarbital had the potential to be equally as effective as Gabapentin and Phenobarbital, defendants did not have the requisite state of mind for deliberate indifference.  Defendants did not know that plaintiff faced a serious risk of harm if the new drug combinations were substituted.  At best, plaintiff has demonstrated a difference of opinion with defendants regarding the proper drugs to treat his seizure disorder.  See Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir. 1996) (differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth Amendment violation).

Plaintiff alleges that when he saw defendant Awatani on June 3, 2013, plaintiff told him that Gabapentin and Phenobarbital were the only drugs that effectively treated his seizure disorder.  (ECF No. 15 at 8; ECF No. 80 at 12.)   However, by that time, plaintiff had been seizure free for a sufficient amount of time for defendant Awatani to reasonably infer that the newly prescribed medication was working.  Therefore, defendant Awatani did not act with deliberate indifference by allegedly disregarding plaintiff's claim that only Gabapentin and Phenobarbital were effective in treating his seizure disorder.  The undersigned also observes that plaintiff has provided no evidence to support this claim.  For example, plaintiff provides no

---

[4]   In his previously submitted declaration, Dr. Fox states that because of plaintiff's substance abuse history, DVI staff tapered him off Gabapentin and Phenobarbital.  (ECF No. 14-1 at 2.) Nothing in the record indicates that either defendant Street or Awatani were aware of plaintiff's alleged previous history of substance abuse.

1   medical records demonstrating that he suffered seizures in the past after being prescribed Tegretol

2   and Keppra.  Accordingly, plaintiff's claim that Gabapentin and Phenobarbital were the only

3   drugs that could treat his seizure disorder is not supported by the record.

4          Defendants also suggest that they did not act with deliberate indifference because plaintiff

5   did not require any seizure medication because he had pseudo-seizures.  This argument is

6   inconsistent with defendants' concession that the issue as to whether plaintiff's seizure disorder

7   constituted a serious medical need is a genuinely disputed fact.  The undersigned also observes

8   that defendants have presented no evidence that plaintiff was ever definitively diagnosed with

9   pseudo-seizures.  In addition, the medical records before the court indicate that plaintiff continued

10  to be prescribed anti-seizure medication even after it was suggested that he suffered from pseudo-

11  seizures.  The July 23, 2013, records from the San Joaquin General Hospital also state,

12  "According to witness, seizure was for four minutes and can be categorized as generalized tonic-

13  clonic." (ECF No. 73-4 at 42.)  According to Dr. Fox's supplemental declaration, a true seizure

14  typically results in tonic-clonic activity.  (ECF No. 94-1 at 3.)

15         Defendants also argue that plaintiff, himself, caused the seizures he suffered in July 2013

16  by refusing to take his prescribed medications.  The problem with this argument is that the

17  medical records submitted by defendants indicate that plaintiff may not have been given one of

18  his anti-seizure drugs, Keppra, from July 11, 2013, to July 14, 2013, when he suffered his first

19  seizure, i.e., he did not refuse to take Keppra.[5]  For this reason, the undersigned does not find that

20

21  [5]   The records indicate that plaintiff refused to take Tegretol, aka, Carbamazepine, on several
    dates: May 11, 2013 a.m., May 12, 2013 p.m., May 13, 2013 a.m., May 14, 2013 p.m., May 15,

22  2013 p.m., May 16, 2013 a.m. and p.m., May 17, 2013 a.m. and p.m., May 18, 2013 a.m., May
    19, 2013 a.m., May 20, 2013 a.m., May 21, 2013 a.m., May 22, 2013 a.m. and p.m., May 23,

23  2013 a.m. and p.m., May 24, 2013 a.m. and p.m., May 25, 2013 a.m. and p.m., May 26, 2013
    a.m., May 27, 2013 a.m., May 28, 2013 a.m. and p.m., May 29, 2013 p.m., May 30, 2013, a.m.

24  and p.m., May 31, 2013 a.m. and p.m., June 1, 2013 a.m. and p.m., June 2, 2013 a.m., June 2,
    2013 a.m., June 3, 2013 p.m. (ECF No. 73-4 at 19.)

25         Defendants have submitted records indicating that plaintiff also refused Tegretol on the
    following additional dates, although these records do not identify the refused dose, i.e., a.m. or

26  p.m.:  June 4, 2013, June 5, 2013, June 6, 2013, June 7, 2013, June 8, 2013, June 9, 2013, June
    11, 2013, June 12, 2013, June 13, 2013, June 15, 2013, June 17, 2013, June 18, 2013,  June 19,

27  2013, June 20, 2013, June 21, 2013, June 22, 2013, June 23, 2013, June 24, 2013,  June 25, 2013,

28  June 28, 2013, June 29, 2013, June 30, 2013, July 7, 2013.  (Id. at 23, 27, 29, 34, 35, 36, 37.)

1   defendants are entitled to summary judgment on this ground.

2          In conclusion, for the reasons discussed above, defendants should be granted summary

3   judgment because they did not act with deliberate indifference when they substituted other anti-

4   seizure medication for Gabapentin and Phenobarbital.

5   VII.   Qualified Immunity

6          Defendants argue that they are entitled to qualified immunity.

7          In analyzing a claim of qualified immunity, a court must examine (1) whether the facts as

8   alleged, taken in the light most favorable to plaintiff, show that the defendant's conduct violated a

9   constitutional right, and (2) if a constitutional right was violated, whether, "in light of the specific

10  context of the case," the constitutional right was so clearly established that a reasonable official

11  would understand that what he or she was doing violated that right.  See Saucier v. Katz, 533 U.S.

12  194, 201–02 (2001).  If no constitutional right was violated, the inquiry ends and the defendant

13  prevails.  Saucier, 533 U.S. at 201.

14         To meet the "clearly established" requirement, "[t]he contours of the right must be

15  sufficiently clear that a reasonable official would understand that what he is doing violates that

16  right."  Anderson v. Creighton, 483 U.S. 635, 640 (1987).  This requires defining the right

17  allegedly violated in a "particularized" sense that is "relevant" to the actual facts alleged.  Id.

18  "Because the focus is on whether the officer had fair notice that her conduct was unlawful,

19  reasonableness is judged against the backdrop of the law at the time of the conduct."  Brosseau v.

20  Haugen, 543 U.S. 194, 198 (2004).

---

21  From these records it is not unreasonable to infer that plaintiff continued to refuse Tegretol in the

22  days leading up to his first seizure.

23         While defendant Street prescribed Keppra for plaintiff on July 11, 2013, in place of
    Dilantin, defendants have submitted a Medication Administration Record indicating that plaintiff
    did not begin receiving Keppra, aka Levetiracetam, until July 24, 2013.  (Id. at 50.)  The

24  Medication Administration Record contains an "x" in the boxes for July 1, 2013, through July 24,
    2013 p.m.  (ECF No. 73-4 at 50.)  The record indicates that plaintiff received his first dose of

25  Keppra on July 24, 2013 in the p.m.  (Id.)  The undersigned interprets the "x" to mean that

26  plaintiff did not receive Keppra.

27         Based on these records, it appears possible that plaintiff may have been taking no seizure
    medication from July 11, 2013 to July 14, 2013, when he had his first seizure.  Therefore,

28  plaintiff's seizure may have been caused, in part, by his failure to receive Keppra.  Plaintiff does
    not raise any claim against defendants regarding his alleged failure to receive Keppra.

1    Courts are not required to address the two inquiries in any particular order.  Rather, courts

2    may "exercise their sound discretion in deciding which of the two prongs of the qualified

3    immunity analysis should be addressed first in light of the circumstances in the particular case at

4    hand."  Pearson v. Callahan, 555 U.S. 223, 243 (2009).

5    Because the undersigned finds that defendants Street and Awatani did not violate

6    plaintiff's constitutional rights in connection with the medication they prescribed for plaintiff's

7    back pain and seizure disorder, the undersigned need not address the qualified immunity analysis

8    any further with respect to these claims.

9    The undersigned next considers qualified immunity with respect to plaintiff's claim

10   against defendant Baath.  Taking the facts in the light most favorable to plaintiff, the undersigned

11   finds that defendant Baath potentially violated plaintiff's constitutional rights when he allowed

12   plaintiff to continue taking Abilify without prescribing another drug to treat the side effect of

13   lockjaw, which plaintiff claims he had a history of suffering.  Taking the facts in the light most

14   favorable to plaintiff, the record demonstrates that plaintiff suffered lockjaw on May 10, 2013.

15   The undersigned further finds that a reasonable doctor would have known that allowing plaintiff

16   to continue taking Abilify, without prescribing another drug to treat the side effect of lockjaw,

17   would violate plaintiff's Eighth Amendment rights.  For these reasons, defendant Baath is not

18   entitled to qualified immunity.

19   Accordingly, IT IS HEREBY RECOMMENDED that defendants' summary judgment

20   motion (ECF No. 73) be granted as to plaintiff's claims against defendants Street and Awatani

21   alleging inadequate pain and anti-seizure medication; defendants' motion be denied as to

22   plaintiff's claim against defendant Baath regarding the discontinuation of Artane.

23   These findings and recommendations are submitted to the United States District Judge

24   assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

25   after being served with these findings and recommendations, any party may file written

26   objections with the court and serve a copy on all parties.  Such a document should be captioned

27   "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

28   objections shall be filed and served within fourteen days after service of the objections.  The

1    parties are advised that failure to file objections within the specified time may waive the right to

2    appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

3    Dated:  July 24, 2015

4

5                                       KENDALL J. NEWMAN
                                      UNITED STATES MAGISTRATE JUDGE

6

7

8    Es2147.sj(2)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28